STATE *versus* JAMES O. McINTYRE *& als.*
STATE *versus* JAMES O. McINTYRE *& als.*
STATE *versus* JAMES O. McINTYRE *& als.*
STATE *versus* JAMES O. McINTYRE *& als.*

If a master in chancery report that he "gave reasonable notice to each and all of the said defendants" of the time and place appointed by him for the hearing of the parties, it is sufficient in the absence of any evidence to the contrary.

If, after reasonable notice, the master proceeds in the absence of the defendant, his report cannot be successfully objected to as being *ex parte*.

When a matter of fact, unaccompanied by any evidence, is urged against the acceptance of the report of a master, the decision of the presiding Judge in accepting it, is not subject to exceptions; as that the master had expressed feelings of hostility to the party objecting; or that he had made certain mistakes in estimating the damages.

In actions upon the class of bonds in which the Court is required to assess the damages, the presiding Judge may, without the consent of the parties, appoint a master for that purpose.

An allowance made to a clerk of the Supreme Judicial Court by the County Commissioners, "for expenses and sums paid out," does not have the force of a judgment, and is not conclusive.

ON EXCEPTIONS from *Nisi Prius*, DAVIS, J., presiding.

The person appointed master in these cases had been previously appointed a general master in chancery by the full Court, under Act of 1862, c. 155, and the "additional rule in chancery."

The remaining material facts will be found in the opinion.

*T. M. Hayes*, for the defendants.

I. The master's report should state what notice was given and when, that the Court might judge whether it were "reasonable" or not. *Ware* v. *Hunnewell*, 20 Maine, 291; *Manhattan Co.* v. *Evertson*, 4 Paige, (C. R.,) 276. This objection may be taken, although not made at the hearing. *White* v. *Johnson*, 2 Mumf., 235.

II. The report should be set aside, because the appointment of the master was unauthorized. In actions at law, auditors only can be appointed. R. S., c. 82, § 59.

Masters are strictly officers of a court in equity, appointed only by the court sitting in equity, and to "perform the duties pertaining to said office according to the practice in equity." Public Laws, 1862, c. 155; Rule, 47 Maine, 599. The duties of an auditor and master are different, their proceedings different, and the effect of their report different. An auditor's report is only evidence, while a master's is taken as true, subject only to exceptions regularly taken. Law jurisdiction of the Court, defined by R. S., c. 77, § 2; Equity jurisdiction, § 8; *Jones* v. *B. Mill Corporation*, 4 Pick., 510; *Norton* v. *Preston*, 15 Maine, 14.

The counsel here went into an elaborate review of the English and American statutes and authorities relating to bonds subject to chancery, which the decision of *Philbrook* v. *Burgess*, 52 Maine, 271, renders it unnecessary to report.

The reports of the master are erroneous upon their face, charging sums received "for services by virtue of his office," which appear by the reports to have been received for "services as clerk;" and these sums are so blended with the total

sums reported, that they cannot be separated.    Cases under note 1, div. 3, letter a, Eastman's Dig., 41.

When a master's report is erroneous on its face, it may be inquired into, although no objection was taken before the master.    *Sweet* v. *Redwood*, 9 Porter, 79 ;    *White* v. *Johnson*, 2 Mumf., 235 ;    *Hook* v. *Sellers*, 1 Den., c. 61.

. By R. S., c. 79, § 9, a clerk is to account only for fees lawfully received for services.

By R. S., c. 116, clerks of courts have no authority to exact and receive fees for any services except those enumerated in that chapter ; and he is not obliged to account for fees received for any other services..

The allowances made by the commissioners are conclusive until reversed.

*Tapley*, for the State.

*Howard & Cleaves*, in reply.

DAVIS, J. — These are several actions of debt, upon the official bonds of McIntire, as Clerk of Courts for the county of York.    They were entered in Court in 1859.    The breaches of the bonds for which damages were claimed were specified August 29, 1860 ; and specifications of defence were filed Dec. 14, 1860.    At the January term, 1861, a general default was entered by consent, and John N. Goodwin was appointed a master in chancery to assess the damages.    The cases were afterwards continued from term to term, until September, 1863, when, there having been no hearing by the master, and, he being unable to serve, E. E. Bourne was appointed in his stead.    At the May term, 1864, his reports were presented for acceptance. To this the defendants made objections in writing ; and the reports having been accepted by the Court, the cases are presented on exceptions.

1. It is objected that the hearing of the master in chancery was *ex parte*.    This was so.    But he gave due notice to the defendants ; and he proceeded in their absence only

because they declined to appear. It would be a strange doctrine to hold that one could defeat legal proceedings against himself on such a ground.

2. It is said, however, as a reason for not appearing, that the master in chancery had expressed feelings of hostility to the defendants, and was not impartial. But no evidence of this was presented to the Court, and being a matter of *fact*, the decision of the Court, that the master was impartial, is one to which no exceptions could be taken.

3. But it is urged, as another reason for not appearing, that the master in chancery was improperly appointed, without the consent of the defendants; and that he had no jurisdiction of the cases. That, in suits upon this class of bonds, the damages are to be assessed by the Court, and not by the jury, was settled in the case of *Philbrook* v. *Burgess*, 52 Maine, 271. In such cases it is sometimes impracticable for the presiding Justice to attend to the hearing personally. There can be no doubt of his authority to appoint a master for that purpose; and the consent of the parties to such appointment is not necessary.

4. Another objection to the acceptance of the reports is that the master made certain mistakes in estimating the amount of fees received by McIntyre as Clerk of Courts. But no evidence was offered of any such mistakes. The amount actually received could probably have been shown by McIntyre, without difficulty; but he declined to make any exhibit, either to the master or to the Court. It is natural to suppose that, if the master had *over* estimated the amount, he would have shown the error, by producing his own account, which he has never done.

5. But it is argued that the reports themselves show that the master charged McIntyre with having received certain sums as *fees*, which were allowed to him by the county commissioners as for *disbursements*. And it is said that the allowance of the commissioners, as "for expenses and sums paid out," is conclusive of that fact, having the force of a

*judgment.* Upon this proposition it is sufficient to make the following suggestions.

1. The county commissioners are authorized to examine and allow claims against the county, and draw orders upon the treasurer for their payment. But these acts do not constitute *judgments,* any more than the auditing, by the proper officers, of claims against towns, or other corporations. Such an allowance, if not paid, may be sufficient to sustain an action, like orders given by selectmen of towns. But it could not be enforced, if payment should be refused, without an action. It is not recorded as such; and it is not analogous to a judgment of any Court, either in its nature, or its effect.

2. But, if this were otherwise, the master's reports do not *impeach* any allowances made by the commissioners to McIntyre. On the contrary, they *affirm* them. So far is the result from annulling or reversing their acts, it is based upon them. The Clerk of Courts performed some services by virtue of his office, for which he was paid by the county, upon the allowance of his claims by the commissioners. For such receipts, as well as others, it was his duty to render his account. *White* v. *Fox,* 22 Maine, 341. The reports of the master in these cases do not question that McIntyre received the payments rightfully. They sustain the action of the commissioners in ordering the treasurer to pay him.

3. In allowing his claims, the commissioners described them as for " expenses and sums paid out." But it by no means follows that they described them correctly. The clerk was bound to account for " all moneys received by him for services by virtue of his office." The commissioners could decide whether the county should *make* certain payments; but there is no pretence of any authority, by statute, or otherwise, for them to decide whether any sums received by him *were for official services.* That question can be determined only by this Court, in suits upon the bonds. The proposition that the county commissioners had

any power to try and adjudicate that question, is as destitute of reason, as it is of authority, to sustain it. Nor is there any evidence that they attempted to exercise any such authority. As in other cases, they merely allowed certain claims against the county, or State, which McIntyre presented to them. But whether he *should account* for the sums he received in payment, they did not pretend to decide. They claimed no power to make any such decision; and, if they had, instead of being conclusive, it would have been void.

These cases appear to have been examined by the master with great care. He probably proceeded with all the more caution on account of the refusal of the defendants to appear before him. If he erred, it was for want of evidence which they might easily have furnished. But the fact that no error was attempted to be shown, when there was an opportunity to do it, before the Court, authorizes the presumption that there is no error in the reports. There can be no doubt, therefore, that the principal defendant, as Clerk of Courts, received money from year to year for which he neglected to render any account, in violation of his official oaths, as well as of his bonds. If the amount is rendered large, by the accumulating interest, at the rate of twenty-five per cent., it is only by reason of his persistent and continued refusal to render any account, even to this time. It is not for him, therefore, to complain of the result. *The exceptions must be overruled in all the cases.*

APPLETON, C. J., CUTTING, WALTON and BARROWS, JJ., concurred.

DICKERSON, J., (dissenting.)—I am unable to concur in the result arrived at by a majority of my associates, and, as the points of difference between us have some general importance, I am unwilling that their opinion should be promulgated, as the law of the land, unchallenged.

Unquestionably the decision in *Philbrook* v. *Burgess* recognizes the right of the Court to assess the damages in the

case at bar.   The same authority, however, deduces this
power, not from the equity side of the Court's jurisdiction,
nor from any statute, but from the common law.   In that
case, the Court say, — "this appears to have been the com-
mon law of New England."   In actions on bonds in a penal
sum, the stipulated amount is not to be regarded as liqui-
dated damages, when the actual damages may be ascertained
without difficulty.   In such cases, it is the gist of the obli-
gation that, while the obligee *may* recover the amount of
the penalty in a certain contingency, he *shall* not, when the
actual damages fall short of that sum.   The penal sum is
inserted in the bond as a guaranty that the obligor shall
fully indemnify the obligee for his undertaking, and, when
he has done this, the obligee has no further claim on him.

In exercising its right to assess the damages in an action
on a bond like the one in suit, the Court is governed by the
principles of the common law, and the rules of practice ap-
plicable thereto.   A court of law that, independently of
statutory provisions, should, in the same case, be governed
by the common law in one branch of its proceedings, and
by equity in another, here dispensing a little law, and there
a modicum of equity, would be a judicial anomaly.   The
Court may hear the evidence, and assess the damages di-
rectly, or it may appoint another to perform that service, as
it may employ the hand of its clerk to assess the damages,
where they are a mere matter of computation, but the dam-
ages are regarded as assessed by the Court; and whether
the person thus appointed be called commissioner, auditor,
assessor, or master in chancery, he must be governed in his
adjudications by the rules of the common law, and cannot
exercise an iota of the distinctive powers of a master in
chancery acting under equity process.   *Pierce* v. *Dearborn*,
34 N. H., 432.

The defendants had the same right to have the damages
assessed upon *legal* principles that they would have had if
the damages had been assessed by a jury.   But the commis-
sion issued by the clerk, and under which Mr. Bourne acted,

State *v.* McIntyre.

afforded them no such security. It happened that Mr. Bourne was a master in chancery, and that the commission was issued to him in that capacity, but, as we have seen, he had no authority to exercise chancery powers in a suit at law. Indeed, the language of the commission defining his duties was not appropriate for an officer at law, or a master in chancery; he was not required to determine what was *legally* due, or what was due " in equity and good conscience," but " to ascertain what was *reasonably* due from the defendants to the plaintiff." He was thus not only at liberty, but it was his duty to determine what he should find to be *equitably* due, provided it should appear *reasonable*, though by so doing he should violate the requirements of law. From the meagre report of the evidence, and proceedings before Mr. Bourne, it is impossible for this Court to determine whether such contingency actually occurred. Nor, indeed, is this necessary, since neither this Court, nor any Judge thereof, sitting at *Nisi Prius*, can confer authority upon any one to violate the law. The commission or appointment, under which the so called master in chancery acted, being primarily and fundamentally defective, gave him no authority whatever to act in the premises.

Another ground of exception, applicable to all the suits, is based upon that clause in the report, which charges the principal defendant with certain gross sums, as moneys received exclusively for services as clerk, after the accounts containing the items which make up these sums had been audited, and allowed by the county commissioners, as accounts " for *services, expenses,* and *bills· paid out.*" The amount thus charged against the defendants in the several reports exceeds three thousand dollars, exclusive of several years' interest at twenty-five per cent. *per annum.*

The R. S., 1841, c. 99, § 3, and the R. S., 1857, c. 78, § 6, authorize and empower the county commissioners of the respective counties " to examine, allow and settle accounts of the receipts and expenditures of the moneys of the county, represent it, and have the care of its property,

and the management of its business, and concerns." It is not denied that the county commissioners had authority " to examine, allow and settle" the accounts in question, but the question is whether, they having done so, it is competent for the Court at *Nisi Prius*, in ordering the acceptance of the report of an assessor, to impeach and set aside their adjudi-, cation.

Though the adjudications of county commissioners may not have the force of judgments of courts of record, yet, when made upon a subject matter within their jurisdiction and in the legitimate exercise thereof, they are final and conclusive until they are annulled or reversed by *certiorari*. *Small* v. *Pennell*, 31 Maine, 270 ; *Woodman* v. *County of Somerset*, 25 Maine, 300 ; *Goodwin* v. *Hallowell*, 2 Greenl., 27 ; *Plummer* v. *Waterville*, 32 Maine, 566.

This doctrine has been so long and repeatedly held in this State, that it would seem presumptuous to question its correctness. It rests upon a foundation too firm to be shaken, and is sustained by grave considerations of public policy. In order to save the county from the vexation and expense of a lawsuit at the instigation of every one who might have a claim against it, the statute has provided a tribunal by whom such claims may be examined and audited, and the amount allowed put into the county tax. The statute imposes upon the commissioners the duty to examine, allow, and settle certain accounts against the county,—a duty which they are not at liberty to neglect, or refuse to perform,—and necessarily makes it compulsory upon claimants to present their claims before them for adjustment ; in other words, their jurisdiction over this subject matter is exclusive. If the commissioners neglect or refuse to examine and audit claims duly presented before them, they may be compelled to adjudicate upon them by writ of *mandamus*; if the claimant neglect to present his account before the board for allowance, he cannot maintain an action therefor against the commissioners, or the county. If either the claimant or the county is aggrieved at the decision of the

commissioners, the case may be revised by this Court on application for a writ of *certiorari*. If neither party do this, the decision of the commissioners is final and conclusive. Upon no other principle can the wise and salutary policy of the statute be upheld; for if persons having claims against the county, of the description mentioned in the statute, could maintain an action thereon without first presenting them before the commissioners for adjustment, or having thus presented them, and being dissatisfied with the decision of the board, could sue the county therefor, the object of the statute would be defeated, and the statute itself become a nullity.

The courts of the State of New York have repeatedly given this construction to a statute of that State, empowering county supervisors "to examine, settle and allow all accounts chargeable to such county, and to direct the raising of such sums as may be necessary to defray the same." In *Brady* v. *The Supervisors of the City and County of New York*, 10 N. Y., 260, the Court of Appeals held that the board of supervisors had exclusive jurisdiction in such matters, and that no action could be maintained for the recovery of a county charge, either against the county or the board of supervisors; and, in *The People* v. *Supervisors of Columbia*, 10 Wend., 363, it was held that, if the board of supervisors refused to act upon claims submitted for their determination, a writ of *mandamus* would issue to compel them to adjudicate upon such claims. In the recent case of *Martin* v. *Supervisors of Green County*, 29 N. Y., 645, the claimant alleged that the supervisors had erred in respect to the amount actually and legally due him, and brought his action against the board to recover the amount of his claim. The Court before whom the action was originally brought decided, as matter of law, that such action of the board was final. The plaintiff appealed to the general term of the Supreme Court, where the judgment was affirmed. Thereupon the plaintiff appealed to the court of appeals, In delivering the opinion of the Court, JOHNSON, J., says,

"the erroneous decision of the board, if it committed any error, furnishes no ground for an original action to recover the same claim; and certainly the law recognizes no such proceeding for the purpose of reviewing and correcting the errors in its decision. On the contrary, as the law gives no appeal from the determinations of the board of supervisors in auditing, allowing, or rejecting claims properly submitted to be audited, it necessarily follows that their action is final and conclusive."

In order to avoid the force of this reasoning and the weight of these authorities, it is asserted that the county commissioners had no authority to decide whether any sums received by the principal defendant were received *for official services.* The answer to this objection is that the statute giving the commissioners jurisdiction over the subject matter does not restrict them to determine *only* what sums were due him for other than official services. On the contrary, their authority to adjudicate upon his claims against the county is general, embracing as well his claims for *official* services, as for other services and sums paid out. Will it be pretended that while the county commissioners may audit and allow a clerk's claim for labor done upon the county buildings at their request, they had no authority to adjust his claim for entering and filing petitions, making out copies, issuing notices, and other multifarious services rendered by him for the county in virtue of his office? And yet this objection involves such an anomaly. The statute admits of no such construction, and it is difficult to perceive that this argument rises above the dignity of a *petitio principii.*

It is the right and duty of county commissioners, in auditing accounts against the county, so to describe them as to prevent fraud, and advise tax payers of the items that enter into the county assessments. Such description is necessary to perpetuate the identity of the claims passed upon; it is part and parcel of the adjudication, and stands or falls with

it. No adjudication would be complete without such iden-
tification.

The suggestion that the master's report does not impeach
the allowances made by the county commissioners would be
entitled to greater consideration if it was sustained by the
report. The language of the report in one of the cases, —
and the same language is used in the other reports, is as fol-
lows : — "At the county commissioner's court for the May
term, 1853, said McIntyre was allowed, *as clerk,* for *service,*
expense and bills paid out, $485,39, and at the October
term, $346,84. * * * I have regarded these sums as allow-
ed him *for his services as clerk.*" The gross amount allowed
McIntyre by the commissioners " for *service, expenses* and
*bills paid out,*" is charged to him in the reports as wholly
" *allowed him for his service as clerk.*" A more direct im-
peachment of an adjudication can scarcely be conceived of.
The argument falls with the assumption upon which it was
predicated.

To accept these reports, therefore, in my judgment, is to
sanction the impeachment, by a mere assessor of damages,
of an unreversed and subsisting adjudication of the county
commissioners upon a subject matter over which they had
exclusive jurisdiction, to overrule the decisions of courts of
the highest authority, and render the statute a nullity. I
think the exceptions should be sustained, and a new hearing
ordered.